COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Annunziata and Agee
Argued at Alexandria, Virginia


FAIRFAX COUNTY SCHOOL BOARD
                                    MEMORANDUM OPINION* BY
v.    Record No. 1159-02-4         JUDGE LARRY G. ELDER
                                       NOVEMBER 19, 2002
SALLY R. FISH


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Michael N. Salveson (Hunton & Williams, on
            briefs), for appellant.

            (Sally R. Fish, pro se, on brief).  Appellee
            submiting on brief.


     The Fairfax County School Board (employer) appeals from a

decision of the Workers' Compensation Commission (the

commission) holding that Sally R. Fish (claimant) is entitled to

medical benefits for ongoing palliative treatment.  On appeal,

employer contends that (1) the commission erroneously concluded

claimant's fibromyalgia is causally related to her industrial

injury by accident, (2) the commission failed to make a finding

regarding whether ongoing treatment was "reasonable and

necessary medical attention" within the meaning of Code

§ 65.2-603, and (3) the evidence does not support a finding that

it was "reasonable and necessary."  We hold the commission

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

implicitly found the treatment was medically necessary and that credible evidence supported both that finding and the finding that claimant's fibromyalgia was causally related to her compensable industrial injury. Thus, we affirm.

On appeal of a decision of the commission, we construe the evidence in the light most favorable to the party prevailing below, and we must uphold the commission's findings of fact if the record contains credible evidence to support them. See, e.g., Lynchburg Foundry Co. v. Goad, 15 Va. App. 710, 712, 427 S.E.2d 215, 217 (1993).

Code § 65.2-603(A)(1) provides that for "[a]s long as necessary after a [compensable industrial] accident, the employer shall furnish or cause to be furnished, free of charge to the injured employee, a physician chosen [in the manner prescribed by the Workers' Compensation Act] and such other necessary medical attention." Whether the employer is responsible for medical expenses under this Code section depends, inter alia, upon "(1) whether the medical service was causally related to the industrial injury; [and] (2) whether such other medical attention was necessary." Volvo White Truck Corp. v. Hedge, 1 Va. App. 195, 199, 336 S.E.2d 903, 906 (1985). A claimant bears the burden of proof on these issues by a preponderance of the evidence. McGregor v. Crystal Food Corp., 1 Va. App. 507, 508, 339 S.E.2d 917, 918 (1986). As with any medical determination to be made under the Act, the opinion of

- 2 -

the treating physician is entitled to great weight.  See, e.g.,
Pilot Freight Carriers, Inc. v. Reeves, 1 Va. App. 435, 439, 339
S.E.2d 570, 572 (1986).

## A.

### CAUSATION

An employer's liability for an industrial injury extends to
"'all the medical consequences and sequelae that flow from the
primary injury.'"  American Filtrona Co. v. Hanford, 16 Va. App.
159, 163, 428 S.E.2d 511, 513 (1993) (quoting 1 Arthur Larson,
The Law of Workmen's Compensation § 13.11 (1992)).  "[A]
'question [of causation] raised by "conflicting expert medical
opinions" is one of fact.'"  Georgia-Pacific Corp. v. Robinson,
32 Va. App. 1, 5, 526 S.E.2d 267, 268 (2000) (quoting Eccon
Constr. Co. v. Lucas, 221 Va. 786, 790, 273 S.E.2d 797, 799
(1981)).  However, once that conflict has been resolved in favor
of the party prevailing below, whether the evidence is
sufficient to prove causation is a question of law subject to
independent review.  See Morris v. Morris, 238 Va. 578, 579, 385
S.E.2d 858, 865 (1985).

Here, the commission was entitled to accept the opinions of
claimant's treating physicians, Drs. A. Bruce Thomas, II, and
Thomas M. Fogarty, over those of employer's experts, Drs. Brian
Schulman and Roger V. Gisolfi.  Further, the opinions of
Drs. Thomas and Fogarty, viewed in conjunction with the record
as a whole, were sufficient to support the commission's finding

- 3 -

that claimant's fibromyalgia was a "'medical consequence[] . . . flow[ing] from [her] primary injury.'"  Hanford, 16 Va. App. at 163, 428 S.E.2d at 513 (quoting 1 Larson, supra, § 13.11).

Dr. Thomas is board certified in physical medicine and rehabilitation with a focus on pain management and has several years experience in treating patients with fibromyalgia. Dr. Thomas and his partner treated claimant for her fibromyalgia for three years before the present proceedings began. Dr. Thomas explained that fibromyalgia is "a complex, chronic condition, which causes diffuse pain in the body's muscles, tendons, ligaments and other soft tissues and often [causes] fatigue."  He further explained that fibromyalgia is commonly triggered by a physical trauma to the body, such as the one claimant experienced on April 29, 1987.

Dr. Thomas opined, based on his treatment of claimant, "[i]t is medically probable that [claimant's] fibromyalgia was caused by her 1987 accident," and "to a reasonable degree of medical certainty, I can attribute [claimant's] present condition to her accident in 1987."  Dr. Thomas noted, as supported by claimant's medical records, that claimant was diagnosed with myofascial pain, a component of fibromyalgia, shortly following her 1987 accident.  Dr. Thomas noted that fibromyalgia is a difficult condition to diagnose and that claimant could not have received a diagnosis of fibromyalgia

when she first displayed symptoms in 1987 because the diagnostic criteria for the condition were not established until 1990.

Dr. Fogarty rendered a similar opinion.  Dr. Fogarty is board certified in internal medicine and psychiatry, treated claimant for four years prior to these proceedings, and reviewed claimant's medical records prior to rendering his opinion regarding her condition.  Dr. Fogarty noted that, in his treatment of claimant, he observed "muscular spasm related to her fibromyalgia [which] was objective and palpable."  He further observed that claimant's medical records contain a 1987 diagnosis of myofascial pain syndrome and "clearly [show] evidence of a myofascial pain syndrome which dates to [her compensable industrial] injury in 1987.  Her pain became severe within months of her fall at work, and her pain began to spread within weeks of the incident."  Dr. Fogarty explained that fibromyalgia "is a term which is frequently interchanged with myofascial pain" and that claimant received an express diagnosis of fibromyalgia from Dr. Katherine Maurath in 1996.

Ultimately, Dr. Fogarty opined that claimant's work injury of April 29, 1987, "continued and progressed into a more generalized myofascial or fibromyalgia pain syndrome."  He noted that "the weight of the evidence is clearly indicated [in claimant's case]" by "the chronology of [claimant's] history," "the amount of her records that are devoted towards her physical therapy modalities," and the absence of "suggestion of any

- 5 -

secondary gain or of a primary psychiatric condition that would explain the course of her illness."

Finally, the office notes of Dr. Paul A. Buongiorno support a finding that he, too, believed claimant's fibromyalgia was causally related to her 1987 injury. Dr. Buongiorno began treating claimant in conjunction with her admission to the pain clinic in 1987, when the symptoms from her industrial injury proved to be both chronic and spreading, and he treated her continuously, for that condition and others, until 1995. Although Dr. Buongiorno's first mention of fibromyalgia appears in his final office note of October 19, 1995, he noted on May 23, 1995, that claimant's problems were merely "a recent flair of her [ongoing] symptoms." Thus, Dr. Buongiorno's notes also support a finding that the "severe myofascial pain syndrome" for which he had treated claimant since 1987 was fibromyalgia and that it was causally related to her industrial injury.

Employer contends the commission could not rely on Dr. Fogarty's opinion because he appears to have believed, incorrectly, that claimant was never able to return to work following the 1987 injury when the evidence shows she was both able to work for four years and able to engage in activities such as skiing without pain or injury in 1992. Employer also notes claimant required almost no medical attention for over two years after her retirement and contends that this fact breaks the causal connection between claimant's subsequently diagnosed

- 6 -

fibromyalgia and her 1987 industrial injury and shows further flaws in claimant's expert medical evidence. We disagree.

Dr. Fogarty's opinion letter is unclear on the state of his knowledge regarding whether claimant returned to work after her 1987 injury. Assuming Dr. Fogarty believed claimant could not work, his belief, though erroneous, did not render his opinion inherently incredible or require its automatic rejection. Whether claimant was able to work was not directly at issue in the proceedings before the commission, and Dr. Fogarty's misunderstanding regarding claimant's ability to work, if one existed, was simply one factor for the commission to evaluate in considering the evidence and determining what weight to give the various medical opinions.

As for whether claimant was able to ski in 1992, the record contains no direct evidence on this point. Rather, it contains two hearsay statements purportedly made by claimant to two of her health care providers. The 1992 records of a physical therapist indicate claimant reported skiing without pain or injury in 1992, whereas Dr. Fogarty's records indicate claimant's 2001 statement that she went on a skiing vacation in 1992 but did not ski. The commission was free to disregard this evidence for any of several reasons. First, as noted above, it was hearsay evidence the reliability of which was indirectly challenged by claimant. Second, as the deputy commissioner found, the evidence established that claimant's condition "waxes

- 7 -

and wanes and will permit her from time to time to increase/decrease her medical treatment regimen and activities." It was undisputed that, from time to time following claimant's retirement in 1992, she was able to engage in activities such as aerobics, bicycling and sailing and that some of these activities were prescribed as treatment for her condition.

Finally, we reject employer's argument that claimant failed to prove the necessary causal link between her industrial injury and fibromyalgia because she required less medical treatment for her condition during the first two-and-one-half years following her retirement in 1992. The evidence supports a finding that claimant's symptoms, although decreased, were ongoing during this period of time and that claimant was able to manage them herself because she now had time to implement a home exercise program, to avoid body postures like prolonged standing or sitting which tended to aggravate her condition, and to rest when necessary.

Claimant's medical records dating back to 1987 indicate her reports that job duties such as "a lot of demonstration and standing," desk work grading papers, and lifting and carrying books aggravated her condition. She also reported that when she was on vacation from school, she experienced less pain because she could "rest, stretch, be physically active, and take care of herself." When she retired in 1992, she continued weekly physical therapy but began to exercise more on her own and was

- 8 -

eventually able to discontinue her physical therapy due to her self-management program.

Although claimant did not receive physical therapy specifically for her 1987 back injury again until 1995, Dr. Buongiorno, who treated claimant for her industrial injury from 1987 through 1995, referred her to physical therapy for an unrelated rib injury in 1992 and asked the therapist to "check [her] old injury," as well. She continued to take Pamelor and Motrin throughout this period of time. In early 1993, when Dr. Buongiorno detected "minor muscle knots" in claimant's cervical region, claimant reported she had been getting less exercise since breaking her rib. In April 1994, claimant reported she was taking sailing lessons but still required Pamelor and Motrin for her back pain. In late 1994, Dr. Buongiorno noted that claimant was "doing well overall" but that she continued those medications and received physical therapy as needed. Finally, claimant reported to Dr. Schulman that while she remained under the care of Dr. Buongiorno, he "would periodically inject . . . novocaine[] into . . . 'multiple trigger sites' throughout her back and chest." She also reported using her TENS unit "for the past ten years." This evidence supported a finding that claimant's pain, although decreased, was ongoing following her retirement and was directly related to the more frequent flare-ups she began to experience in 1995.

- 9 -

Thus, the opinions of Drs. Thomas and Fogarty, coupled with claimant's medical records dating back to her 1987 injury, constitute credible evidence that claimant's condition, fibromyalgia, was causally related to her industrial injury, despite the opinions of Drs. Schulman and Gisolfi that no causal connection existed.[1]

---

[1] Employer also objects to the commission's consideration of the opinion of a massage therapist, Alta Sue Muris, in its analysis of the causation issue, arguing that the ability to express medical opinions lies within the exclusive province of licensed physicians. See, e.g., Woehr v. Bridgewater Home, Inc., No. 151-55-14 (Va. Workers' Comp. Comm'n Dec. 6, 1994) (noting that commission's recognized exception to hearsay rule which permits admission of medical opinions over hearsay objection does not extend to opinions by physical therapists "except to the extent such opinions may be ratified and incorporated into the medical reports of licensed physicians as their own opinions").

Assuming without deciding that the commission's repeated holdings that only doctors can express medical opinions is the correct state of the law, we presume, in the absence of evidence to the contrary, that the commission knew and followed its own repeated prior pronouncements of the law. See Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977) (holding trial court is presumed to know and properly apply the law "[a]bsent clear evidence to the contrary in the record"). Here, the commission merely mentioned in its recitation of the facts Muris's statement that claimant "has no desire to be in a sick role." The commission, in its legal analysis, made no mention of Muris's opinion and said merely that the relatedness of the fibromyalgia to her industrial injury "is readily traceable through the medical records, and is further substantiated by the claimant's current authorized treating physicians." (Emphasis added). Thus, we presume no error occurred.

- 10 -

B.

"NECESSARY" MEDICAL TREATMENT UNDER CODE § 65.2-603

"[N]ecessary medical attention" under Code § 65.2-603 may include palliative treatment. H.J. Holz & Son, Inc. v. Dumas-Thayer, 37 Va. App. 645, 655, 561 S.E.2d 6, 11 (2002). "Whether 'such other medical attention' be deemed necessary is for the attending physician or . . . [c]ommission to determine, not the employer." Jenson Press v. Ale, 1 Va. App. 153, 159, 336 S.E.2d 522, 525 (1985) (decided under former Code § 65.1-88, predecessor to Code § 65.2-603). It is a mixed question of law and fact. Goad, 15 Va. App. at 712-13, 427 S.E.2d at 217.

Employer contends both that the commission failed to make a finding regarding whether ongoing treatment was "reasonable and necessary medical attention" within the meaning of Code § 65.2-603 and that the evidence does not support such a finding. Again, we disagree.

The deputy commissioner concluded explicitly that the challenged treatment was "reasonable and necessary." Although the commission did not specifically repeat the deputy's finding on this issue and did not make an express finding that the treatment was "necessary," it recognized that claimant bore the burden of proving "such other medical attention was necessary," and it expressly affirmed the deputy's "Opinion." Although the better practice would be for the commission to make express

- 11 -

findings of fact and conclusions of law on disputed issues, we conclude the commission's holding was sufficient.

We hold further that the evidence was sufficient to support this ruling. Treating Physician Thomas, board certified in physical medicine and rehabilitation, opined that the symptoms of fibromyalgia, if untreated, can become "severely disabling and progressive." He noted that claimant is "extremely compliant in maintaining a home program of aerobic muscle conditioning and stretching and reducing as many environmental triggers as possible." Dr. Fogarty agreed that claimant "has been a disciplined and compliant patient who has dealt with her illness in an exemplary fashion."

In addition to claimant's independent efforts, Dr. Thomas described the various treatments he has prescribed "to improve [claimant's] symptoms, with much success":

> I have prescribed Serzone and Flexeril to reduce her pain, diminish her fatigue, and relax her muscles when she is having severe spasms. Stretching, myofascial release and other physical therapies have been used. [Claimant] requires treatments such as trigger point injections, acupuncture, biofeedback, EEG-driven stimulation and relaxation therapy. These treatments used alone or in combination have been particularly successful in [claimant's] case but provide only temporary relief. They allow her to remain independent in her functional mobility and self care skills and control her pain to a moderate level most of the time. It is evident in my opinion that without these treatments [claimant] would be living an unbearably pain filled dependent life.

Dr. Fogarty's opinion letter supported this conclusion. Although Dr. Fogarty did not focus on the treatments claimant had received in as specific a fashion as Dr. Thomas did, he expressly noted that "[his] role in [claimant's] treatment has been to assist in coordinating her physical therapy modalities and managing her pain as well as associated anxiety, depression and insomnia with medication, in an effort to optimize her functional capacity." His records established that he prescribed ongoing physical therapy, massage therapy, acupuncture and trigger point injections. Dr. Fogarty also noted that, in addition to claimant's own efforts, "[claimant] has been able to maintain a level of function and reduction of pain due to the diligent efforts of many professionals over an extended period of time."

Thus, Dr. Thomas's opinion, which the commission found credible and which employer conceded on brief was "probative" on "the medical necessity issue," supported by Dr. Fogarty's opinion, established that claimant's ongoing treatments for her fibromyalgia, including trigger point injections and physical therapy, are "necessary" treatments within the meaning of Code § 65.2-603. The fact that the record may contain a contrary opinion from Dr. Schulman is irrelevant because credible evidence supports the decision of the commission.

For these reasons, we hold that the commission implicitly found the challenged treatment was medically necessary and that credible evidence supported both that finding and the finding that claimant's fibromyalgia was causally related to her compensable industrial injury. Thus, we affirm.

<u>Affirmed.</u>